# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHARLES RULAND, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>INFOSONICS CORP., JOSEPH RAM, JOHN J. ALTHOFF, JEFFREY KLAUSNER, JOSEPH MURGO, and ABRAHAM ROSLER,<br><br>Defendant. | CASE NO. 06cv1231 BTM(WMc)<br><br>**ORDER CONSOLIDATING CASES, APPOINTING ROBERT SIBLEY AS LEAD PLAINTIFF, AND APPROVING LEAD COUNSEL** |
| PETER POLIZZI, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>INFOSONICS CORP., JOSEPH RAM, JEFFREY KLAUSNER,<br><br>Defendants. | CASE NO. 06cv1233 BTM(WMc) |
| THOMAS E. SOWELL, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>INFOSONICS CORP., JOSEPH RAM, JOHN J. ALTHOFF, JEFFREY KLAUSNER, JOSEPH MURGO, and ABRAHAM ROSLER,<br><br>Defendants. | CASE NO. 06cv1309 BTM(WMc) |

1   06cv1231; 06cv1233; 06cv1309; 06cv1331; 06cv1378; 06cv1435

| | |
|---|---|
| PAUL MARCOUILLER, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>INFOSONICS CORP., JOSEPH RAM, JEFFREY KLAUSNER,<br><br>Defendants. | CASE NO. 06cv1331 BTM(WMc) |
| BLAKE J. ANDERSON, individually and on behalf of all other similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>INFOSONICS CORP., JOSEPH RAM, JEFFREY KLAUSNER,<br><br>Defendants. | CASE NO. 06cv1378 BTM(WMc) |
| ELLA M. SEAGO, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>INFOSONICS CORP., JOSEPH RAM, JEFFREY KLAUSNER, ABRAHAM G. ROSLER,<br><br>Defendants. | CASE NO. 06cv1435 BTM(WMc) |

Motions to consolidate and competing motions for appointment of lead plaintiff and approval of lead plaintiff's selection of counsel were filed by (1) Robert Sibley, Mark Ungar, and Robert Lorizio ("SUL Group"); (2) Jonathon Ordway and Craig Coletta ("Ordway/Coletta"); (3) Richard A Smee, Julio J. Ledesma Padilla, Edward K. Sowell, James McCoy, Larry B. Stewart and Robert Kaplan ("Smee Group"); and (4) Elizabeth Brown and Larry Christofferson ("Brown/Christofferson"). Motions filed by the "Virk Group" and the "InfoSonics Investor Group" were withdrawn.

The Court held a hearing on the motions on October 11, 2006. For the reasons discussed below, the Court **GRANTS** the various motions to consolidate, **GRANTS** the SUL

Group's motion for appointment of lead plaintiff as it pertains to Robert Sibley only, and **GRANTS** the SUL Group's motion for approval of lead plaintiff's selection of counsel. All other motions for appointment of lead plaintiff and approval of counsel are **DENIED**.

## I. BACKGROUND

All of these class actions are brought by purchasers of common stock of InfoSonics Corp. ("InfoSonics') between May 8, 2006 and June 12, 2006. All of the actions allege that InfoSonics and its top officers engaged in a scheme to defraud InfoSonics investors by reporting false financial results on May 8, 2006 for its first quarter ending March 31, 2006. Defendants allegedly knew, or with deliberate recklessness disregarded, that InfoSonics had improperly accounted for warrants it issued in connection with a January 2006 private placement. On June 12, 2006, InfoSonics disclosed that it would need to restate its reported net income for its first quarter of $1.738 million to $1.173 million due to the fact that InfoSonics had improperly treated the warrants as a derivative liability instead of equity. InfoSonics stock fell more than 28% that day.

All of the actions include as defendants InfoSonics, Joseph Ram (current President, CEO, and Director), and Jeffrey A. Klausner (CEO since 2003), and assert causes of action under Section 10(b) of the Exchange Act and Section 20(a) of the Exchange Act. The Seago case, 06cv1435, also names as a defendant Abraham Rosler (Executive Vice President and a Director). The Ruland case, 06cv1231, and Sowell case, 06cv1309, also name as defendants Rosler, John J. Althoff (President of Latin American operations), and Joseph Murgo (Vice President of North American Sales & Marketing). Ruland and Sowell also assert an additional cause of action under Section 20A of the Exchange Act (for insider trading).

## II. DISCUSSION

A. Consolidation

Consolidation is appropriate when there is a "common question of law or fact . . .

pending before the Court." Fed. R. Civ. P. 42(a). All of these actions cover the same time period, arise out of the same facts, and allege violations of the securities laws. Therefore, the cases should be consolidated.

B.  Lead Plaintiff

Four different groups of plaintiffs seek to be appointed lead plaintiff: (1) the SUL Group; (2) Ordway/Coletta; (3) the Smee Group; and (4) Brown/Christofferson. Brown/Christofferson has filed a notice of non-opposition to Ordway/Coletta's motion. For the reasons discussed below, the Court finds that Robert Sibley of the SUL Group is the proper lead plaintiff.

1.  Governing Law

Under the Private Securities Litigation Reform Act ("PSLRA"), no later than 20 days after filing a class action securities complaint, a private plaintiff or plaintiffs must publish a notice advising members of the purported plaintiff class of the pendency of the action, the claims asserted, and that any member of the purported class may move the court to serve as lead plaintiff. 15 U.S.C. § 78u-4(a)(3)(A)(i). Not later than 60 days after the date on which the notice is published, any member of the purported class may move the court to serve as lead plaintiff of the purported class. Id.

Within 90 days after publication of the notice, the Court shall consider any motion made by a class member to serve as lead plaintiff. 15 U.S.C. § 78u-4(a)(3)(B)(i). The Court shall appoint as lead plaintiff "the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of class members." Id.

The presumptively most adequate plaintiff is the one who "has the largest financial interest in the relief sought by the class" and "otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I). "In other words, the district court must compare the financial stakes of the various plaintiffs and

determine which one has the most to gain from the lawsuit. It must then focus its attention on *that* plaintiff and determine, based on the information he has provided in his pleadings and declarations, whether he satisfies the requirements of Rule 23(a), in particular those of 'typicality' and 'adequacy.'" In re Cavanaugh, 306 F.3d 726, 730 (9th Cir. 2002).

The presumption of adequacy may be rebutted only upon proof by a member of the purported plaintiff class that the presumptively most adequate plaintiff will not fairly and adequately protect the interests of the class or is subject to unique defenses that render such plaintiff incapable of adequately representing the class. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II). If the district court determines that the presumptive lead plaintiff does not meet the typicality or adequacy requirement, the Court must then proceed to determine whether the plaintiff with the next lower stake in the litigation has made a prima facie showing of typicality and adequacy. Cavanaugh, 306 F.3d at 731. If so, that plaintiff becomes the presumptive lead plaintiff and other plaintiffs must be given the opportunity to rebut that showing. Id.

A straightforward application of the statutory scheme "provides no occasion for comparing plaintiffs with each other on any basis other than their financial stake in the case." Cavanaugh, 306 F.3d at 732. Once the Court identifies the plaintiff with the largest stake in the litigation, "further inquiry must focus on that plaintiff alone and be limited to determining whether he satisfies that other statutory requirements." Id.

### 2. Groups of Plaintiffs

As an initial matter, the Court must determine whether it will allow a group of plaintiffs to be designated "lead plaintiff."

The PSLRA provides that the court shall appoint as lead plaintiff "the member *or members* of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of class members . . . ." 15 U.S.C. § 78u-4(a)(3)(B) (emphasis added). The PSLRA also provides that the court is required to adopt a presumption that the most adequate plaintiff is "the person *or group of persons*" that has the largest financial interest and otherwise satisfies the requirements of Rule 23. 15 U.S.C. §

1  78u-4(a)(3)(B)(iii)(I) (emphasis added).

2  Accordingly, it seems that there are instances where it is proper to appoint a group
3  of persons as "lead plaintiff." However, the PSLRA does not provide any guidance as to
4  when multiple plaintiffs should be permitted to serve as lead plaintiff.

5  Some courts have allowed aggregation of unrelated plaintiffs without imposing
6  additional requirements. See Aronson v. McKesson HBOC, Inc., 79 F.Supp.2d 1146, 1153
7  n.8 (N.D. Cal. 1999) (listing cases). Others have held that the term "group" should be
8  construed narrowly to mean a group of persons with meaningful preexisting relationships and
9  the cohesiveness to actively oversee the litigation. Aronson; In re Network Associates, Inc.,
10 Sec. Litig., 76 F. Supp. 2d 1017, 1023-27 (N.D. Cal. 1999); In re Razorfish, Inc. Sec. Litig.,
11 143 F. Supp. 2d 304 (S.D.N.Y. 2001); In re Telxon Corp. Sec. Litig., 67 F. Supp. 2d 803, 815
12 (N.D. Ohio 1999).

13 The cases that hold that the term "group" does not extend to any collection of
14 individuals explain that one of the principal purposes of the PSLRA was to prevent lawyer-
15 driven litigation and to allow for institutional plaintiffs with big financial stakes and expertise
16 in the area to serve as lead plaintiff and control the litigation. Network Associates, 76 F.
17 Supp. 2d at 1023. If courts permit lawyers to designate unrelated plaintiffs as a "group" and
18 aggregate their financial stakes, the purpose of the PSLRA would be undermined. As
19 explained by one district court:

> The larger the group, the less incentive any single member of the group - and certainly the group as a whole - will have to exercise any supervision or control over the litigation . . . . This is especially so if the group consists of not only a larger number of persons, but also of persons who bear no relation and have no connection with one another beyond the fact that they suffered financial loss as a result of a drop in the price of their shares of stock. Without some cohesiveness within the group, or something to bind them together as a unit, there is no reason for the individual members of the group to speak and act with a uniform purpose . . . and, because there is no reason for the individual members to act collectively (no structure for decision making, etc.), the group as a whole will not engage in monitoring. Thus the problem sought to be remedied by the [Reform Act's] lead plaintiff provisions will remain unaddressed.

27 Telxon Corp., 67 F. Supp. 2d at 815-16.

28 The reasoning of these cases is persuasive. Appointment of lead counsel should not

depend on which law firm can accumulate the most class members.

Here, it does not appear that there is any real preexisting relationship between or among the various members of the individual groups. The tie that binds the members of each group is representation by the same lawyers. Therefore, the Court will look at each movant individually when evaluating who should be appointed lead plaintiff.

### 3. Lead Plaintiff Analysis

#### a. Notice and Publication

Shalov Stone & Bonner LLP, counsel-of-record in 06cv1233, published the required notice in *Market Wire* on June 13, 2006. Hulett Harper Stewart LLP, counsel-of-record in 06cv1231 and 06cv1309, also published a notice in PRNewswire on June 15, 2006. The various motions are timely filed.

#### b. Financial Interest

There is no prescribed method for determining which movant has the largest financial interest. The Ninth Circuit notes that "the court may select accounting methods that are both rational and consistently applied." Cavanaugh, 306 F.3d at 730 n. 4.

Many courts apply the following four factors in making the financial interest determination: (1) the number of shares purchased; (2) the number of net shares purchased; (3) the total net funds expended by the plaintiffs during the class period; and (4) the approximate losses suffered by the plaintiffs. Lax v. First Merchant's Acceptance Corp., 1997 WL 461036, * 5 (N.D. Ill. Aug. 11, 1997); In re Olsten Corp. Securities Litig., 3 F. Supp. 2d 286, 296 (E.D.N.Y. 1998). In re McKesson HBOC, Inc. Securities Litig., 97 F. Supp. 2d 993 (N.D. Cal. 1999).

The application of the first three factors is rather straightforward. Movant Sibley (of the SUL Group) purchased the greatest number of shares during the class period – 102,380. (See Exh. E to Supp. Decl. of Weber.) Movant Ordway (of Ordway/Coletta) purchased 63,500 shares, the next greatest number. Sibley also had the greatest number of net shares

(shares purchased minus shares sold during the class period) - 40,480. Ordway's net shares equaled 30,000. However, Ordway expended more net funds (amounts spent on class period purchases less proceeds of class period sales) than Sibley. Ordway expended total net funds of $828,919 as compared to $768,859.25 expended by Sibley.

Sibley and Ordway disagree over how to calculate the fourth factor, approximate losses. Ordway argues that approximate loss should be measured by net loss. Ordway's net loss is $258,419 while Sibley's net loss is $183,521. Sibley argues that approximate loss should be measured by the cost of retained shares less the price at which those shares were sold. (Sibley calls this loss calculation a "Dura Loss.") Under Sibley's method, Sibley's losses are $405,946.56 and Ordway's losses are $150,462.00.

The difference between the two methods is that Ordway's net loss method takes into account losses (in Ordway's case) and gains (in Sibley's case) made on trades before the June 12 announcement, whereas Sibley's method eliminates the effect of the "in-and-out" trades. Although there is no clear correct method for determining approximate loss, the Court finds that Sibley's method is the better measure of financial stake in the case.

The focus of the Court's evaluation is which movant "has the most to gain from the lawsuit." Cavanaugh, 306 F.3d at 730. Although a precise determination of damages is not possible at this stage of the litigation, courts typically equate "largest financial interest" with the amount of *potential recovery*. Siegall v. Tibco Software, Inc., 2006 WL 1050173 (N.D. Cal. Feb 24, 2006); In re Network Associates, Inc., Sec. Litig., 76 F. Supp. 2d 1017, 1030 (N.D. Cal. 1999).

In Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336 (2005), the Supreme Court held that a plaintiff binging a federal securities fraud action must prove proximate causation and economic loss. The Supreme Court explained that an inflated purchase price due to deception or misrepresentation does not in and of itself constitute or proximately cause the relevant economic loss. At the moment the transaction takes place, the plaintiff has suffered no loss because the inflated purchase payment is offset by ownership of a share that *at that instant* possesses equivalent value. Id. at 343. If the purchaser sells the shares before the

truth becomes known, the misrepresentation will not have led to any loss. Id. If the purchaser sells the shares after the truth is disclosed, "an initially inflated purchase price *might* mean a later loss." Id. However, "[w]hen the purchaser subsequently resells such shares, even at a lower price, that lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price."

Here, there does not appear to be any allegation that the truth began to leak out before June 12, 2006. Furthermore, it would be too complicated at this stage of the litigation to make findings of fact regarding any potential partial disclosures and the effect, if any, these disclosures had on the price of the stock. Therefore, the Court will not consider any losses suffered by Ordway as a result of transactions prior to that date. See Kops v. NVE, 2006 WL 2035508 (D. Minn. July 19, 2006) (explaining that unless a partial disclosure occurred before the end of the Class Period, the plaintiff who sold all of his shares before the truth was revealed did not suffer any loss as a result of the defendants' actions). See also In re McKesson HBOC, Inc., Sec. Litig., 97 F. Supp. 2d 993 (N.D. Cal. 1999) (holding that it was inappropriate to count losses or profits by "in-and-out" traders and assuming a constant fraud premium despite movant's argument that partial disclosures may have begun seeping into the pool of information available to the investors).

Similarly, the Court disregards any gains made by Sibley as a result of in-and-out transactions prior to June 12. All of the stock sold by Sibley during the class period was also purchased during the class period. Accordingly, it makes sense for the Court to assume that the "fraud premium" – the amount by which the stock price was inflated because of the alleged misrepresentations – stayed constant during the four-week class period. Network Associates, 76 F. Supp. 2d at 1027. Therefore, any profits made by Sibley during this time would not be attributable to the misrepresentations and should not offset future losses.[1]

---

[1] Had Sibley purchased stock before the class period and sold it for a profit during the class period, such windfall gains would be deducted from Sibley's losses.

Ignoring in-and-out losses or gains, the focus is on the net number of shares purchased. "At least as a first approximation, the candidate with the most net shares purchased will normally have the largest potential damage recovery." Network Associates, 76 F.Supp. 2d at 1027.

As discussed above, Sibley has the greatest number of net shares purchased - 40,480. Accordingly, for our purposes, Sibley has the largest potential recovery. Of course, what damages may be ultimately recovered by the various plaintiffs is a different issue that the Court does not decide.

        c.     Typicality and Adequacy

Claims are "typical"under Rule 23 if they are "reasonably co-extensive with those of absent class members; they need not be substantially identical." Hanlon v. Chrysler Corp., 150 F.3d 1011, 1019 (9th Cir. 1998). Sibley's claims arise out of the same events and are based on the same legal theories as the claims of the other class members. Therefore, Sibley satisfies the "typicality" requirement.

Representation is "adequate" when the representative's interests are not antagonistic to the interests of absent class members, it is unlikely that the action is collusive, and counsel for the class is qualified and competent. In re Northern Dist. of Cal., Dalkon Shield IUD Prod. Liab. Litig., 693 F.2d 847, 855 (9th Cir. 1982). Sibley has made a prima facie showing of adequacy which has not been rebutted by the other movants. Sibley certainly has incentive to prosecute this action vigorously and states that he is willing to serve as a representative on behalf of the class. (Sibley Decl., ¶ 3.) There is no showing that there is collusive action, and Sibley's retained counsel is clearly qualified and competent.

Accordingly, the Court appoints Sibley as lead plaintiff.

    4.     Lead Counsel Analysis

Under the PSLRA, once the court has designated a lead plaintiff, that plaintiff "shall subject to the approval of the court, select and retain counsel to represent the class." 15

U.S.C. § 78u-4(a)(3)(B)(v). The PSLRA "evidences a strong presumption in favor of approving a properly-selected lead plaintiff's decisions as to counsel selection and counsel retention." In re Cedant Corp. Litig., 264 F.3d 201, 276 (3d Cir. 2001).

The Court's inquiry should be "limited to whether the lead plaintiff's selection and agreement with counsel are reasonable on their own terms." Cedant, 264 F.3d at 276. Ultimately, the inquiry concerns "whether the lead plaintiff's choices were the result of a good faith selection and negotiation process and were arrived at via meaningful arms-length bargaining." Id.

The SUL movants ask the Court to approve their selection of Klafter & Olsen and Berger & Montague to serve as co-lead counsel and Hulett Harper Stewart LLP to serve as local "liaison counsel." It appears that all of these firms have the expertise to fulfill the role of lead counsel.

As explained at the hearing, Sibley contacted Klafter & Olsen as a result of the published notice. The Court has no reason to believe that the retention of Klafter & Olsen was anything other than the result of a good faith selection and negotiation process.

Accordingly, the Court approves Klafter & Olsen and Berger & Montague as co-lead counsel and Hulett Harper Stewart LLP as local liaison counsel. As discussed at the hearing, the Court cautions counsel to avoid duplicating work done by co-counsel, performing unnecessary work, or incurring unjustified costs.

### III. CONCLUSION

For the reasons discussed above, the motions to consolidate are **GRANTED**. Case Nos. 06cv1231, 06cv1233, 06cv1309, 06cv1331, 06cv1378, and 06cv1435 are hereby consolidated for all pretrial proceedings. The caption page on all future filings shall contain all of the captions. All future docketing will be done in Case No. 06cv1231, which shall be the main file.

The Court also **GRANTS** the SUL Group's motion for appointment of lead plaintiff as it pertains to Robert Sibley only. The Court appoints Robert Sibley as lead plaintiff. The

1  Court also **GRANTS** the SUL Group's motion for approval of lead counsel.  The Court
2  approves Klafter & Olsen and Berger & Montague as co-lead counsel and Hulett Harper
3  Stewart LLP as local "liaison counsel."   The Court **DENIES** the remaining motions for
4  appointment of lead plaintiff and motions for approval of lead counsel.
5  **IT IS SO ORDERED.**

DATED:  October 23, 2006

_____
Hon. Barry Ted Moskowitz
United States District Judge